Case number 20-1443. Charles Erwin petitioner versus Federal Aviation Administration. Mr. Burns for the petitioner. Ms. Gardner for the respondent. Are you ready for me to commence? Yes, please proceed. May it please the court. Joshua Burns of Crow and Dunleavy for the petitioner. Charles Clay Erwin. In 2016, Mr. Erwin was diagnosed with alcohol use disorder. Following treatment, the FAA issued Mr. Erwin an authorization for special issuance, which allowed Mr. Erwin to return to work as a pilot, but which required Mr. Erwin to abstain from alcohol completely. The authorization worked exactly as it was supposed to, in that it balanced the livelihood of an airman with the need for public safety. Mr. Erwin held his end of the bargain in this situation. He has been abstinent from alcohol for nearly five years. His last drink was in November of 2016. Mr. Erwin's only mistake in this situation, if you can call it a mistake, was eating pulled pork that unbeknownst to him was cooked in beer. Contrary to the recommendation of its own retained experts, the FAA withdrew Mr. Erwin's and Mr. Erwin respectfully requests that this court reverse that decision. Mr. Burns, let me ask you, can a pilot with a diagnosed substance dependence ever get an unrestricted medical certificate? You must think he is able to, or you wouldn't have brought your lawsuit, but I couldn't find an answer to that in any of the regs or anything else we looked at, and I'm going to ask the FAA lawyer the same question. And I believe the answer according to the FAA regs is yes, your honor, because if we're looking at bear with me for one moment while I get to the FAA's brief in this action, it actually cites to a regulation that indicates that following that they must essentially remain on a restricted certificate for a period of two years. I'm looking at page five through six of the FAA's brief in this action. It says an established medical history, this is citing to 14 CFR section 67.101, which indicates that where there is an established history or clinical diagnosis of substance dependence, that is a situation where a restricted authorization should be issued. However, it can be made into a fulsome authorization upon a total abstinence from the substances for not less than the preceding two years. What about this lifetime monitoring? That is, as I understand it, a proposed newly instituted FAA requirement that for people that at this point in time would essentially remain on monitoring for the rest of their life. But they still could get an unrestricted medical certificate? I believe that's a question for the FAA. But what's your understanding? My understanding is that they would have an otherwise unrestricted authorization except for the fact that they would still be subjected to monitoring testing requirements essentially. In that world, it would not be a fully unrestricted authorization. It would still be subject to an ongoing monitoring requirement. But again, I believe this is proposed rulemaking. I'm not sure if these rules are in place at this point in time. I am speculating a little bit about what the FAA has done or intends to do with respect to lifetime monitoring. All right. Thank you. I'll ask Ms. Gardner. Thank you. Mr. Burns, I have two questions. What's exactly the remedy you want from us? I ask because the first authorization expired in 2020, right? That's the one we're reviewing. We're reviewing the FAA's withdrawal of the first authorization. That's correct. Okay. Now that's expired. Well, it would have expired if it had still been in place. Yes, Your Honor. So what's the remedy you want? What do you want from us? We would like the court to determine that the revocation, the withdrawal of the initial authorization was improper, that it was arbitrary and capricious. Okay. And then what will the FAA, what will the agency, if we do that, what will it have to do? Well, I believe- That way. We would ask the FAA at that point to evaluate Mr. Irwin's application as though he were coming off of a special issuance authorization in 2020 and to consider him for an unrestricted authorization. Sorry. Second question is this. So for Mr. Irwin to be eligible for an unrestricted certificate, 107A4 requires established clinical evidence of recovery, including sustained total abstinence from alcohol for not less than the preceding two years. Yes, sir. Now, did that evidence exist in the record at the time Barry wrote his letter? At the time what? At the time that the surgeon, Barry, is that his name? Is that who? The federal insurgent. Sago, was it? No, the Barry letter, the letter we're reviewing. Oh, the air surgeon. The air surgeon's letter. Did that evidence, was there evidence in the record at the time he wrote that letter that you believe supports both of those? I believe it does, Your Honor. I believe that the period of time between when Mr. Irwin began his period of abstinence and when that authorization, or I'm sorry, that withdrawal of the authorization in September of 2020 occurred, he had maintained his sobriety for almost four years at that point in time. Now that we're before this court, it's been almost five years of total abstinence that we believe the evidence universally and unilaterally supports the opposition that he has maintained his abstinence for that entire period of time. So yes, I believe he would satisfy the requirements for an unrestricted authorization at that point in time as of either September 2020 when that letter was issued or as of May 2020 when I believe his initial authorization would have expired had it still been in place up until that time. I guess, counsel, I'm still not sure that I understand your answer to Judge Tatel's question and Judge Henderson's question. What difference does it make if we deny your petition? Because today your client can apply for an unrestricted certificate, right? Well, I don't believe he can today because he is currently on a new special issuance certificate that does not expire until some point farther into the future. So he would only be entitled to apply for that as I understand it when his current certificate expires. And so, and additionally, there are consequences just to the withdrawal of the certificate here. I mean, he was put on a last chance contract with his employer that could likely be undone. It was based purely on the fact that the FAA had made a determination that they needed to withdraw his authorization due to a positive test. If we reverse that decision, he has the opportunity to essentially undo that contract, void that contract with his employer, which is a very draconian remedy here. And fundamentally, your honor, he has the right to clear his name. He was unlawfully accused of violating the terms of his certificate with the FAA and it besmirched his reputation. He has the opportunity to reverse that decision, which was based on a complete lack of evidence. It was arbitrary and capricious to the highest degree, and he has the right to remedy that. Now, given our standard of review, how you cite in your brief that the standard of review is sometimes governed by the Federal Aviation Act and sometimes by the Administrative Procedure Act, but I didn't necessarily see in your briefing how our standard of review would be different as to these issues under the APA versus the FAA. Did I miss that? No, I believe that's correct, your honor. I think we're dealing with an arbitrary and capricious and substantial evidence standard in either circumstance, your honor. I mean, given that very differential standard whereby even if we thought that maybe the FAA did not have, maybe we would decide it differently, or maybe we would feel like preponderance of evidence were on your side. If there were substantial evidence, we would still have to deny your petition. So given that, what's your argument for how you meet that standard of review? Your honor, I see that my time has expired. Is it all right if I proceed? Go ahead and answer. Yes. Well, the only evidence in this case that supports the proposition that Mr. Irwin did not maintain his abstinence is the positive test. And if we're talking about a scientific organization like the Federal Air Surgeon Branch of the FAA, they're required to abide by scientific standards in doing that. In responding to our brief and their response, the FAA attached an appendix, which included several articles that universally, I mean, first of all, those were not part of the record that was before the Federal Air Surgeon, so we don't believe that those are actually properly before this court. But those articles recognize the fact that the FAA cannot apply this positive test alone as a basis to have actions taken against Mr. Irwin with respect to his livelihood. First of all, those articles say that the threshold should be set much at 200 or 250 nanograms per milliliter in order to avoid the risk of exogenous exposure, which is exactly what happened here. And second of all, those articles indicate that the decision makers should be taking, if there is a positive test, the decision makers should be taking into consideration all of the clinical evidence. And all of that clinical evidence, that meaning what Mr. Irwin said, what the factual evidence indicated, all of that universally points to the fact that Mr. Irwin maintained his abstinence and abided by the terms of his authorization, which only required him to maintain his abstinence and to subject himself to random testing, both of which he did. A positive test by itself is not a basis for saying that he violated his authorization. Thank you, Your Honors. I will certainly answer any additional questions, though I know that I'm well out of time. All right. Ms. Gardner. Ms. Gardner. Yes. Good morning, Your Honor. Go ahead. Good morning. May it please the Court. Casey Gardner on behalf of the FAA. This case is about a commercial airline pilot with a diagnosis of alcohol use disorder who tested positive on a random alcohol test. In light of that test, the FAA withdrew his medical standards, which he does not meet by virtue of his clinical diagnosis. So what we're talking about here today is not your regular standard run-of-the-mill medical certificate. It's an exemption from the regulations that was issued to Mr. Irwin by the Federal Air Surgeon. And accordingly, his authorization is only valid to the extent that he complies with its conditions, because those are the conditions that the Federal Air of his aeromedical judgments, those are the conditions that allow Mr. Irwin to fly passengers without endangering public safety. And as soon as he fails to comply with those conditions, his authorization can be withdrawn. And that's what happened here. In January of 2019, the FAA received a report from Mr. Irwin's sponsoring aviation medical examiner, stating that he had tested positive on an alcohol test. That information showed to the Federal Air that Mr. Irwin had failed to comply with the terms of his authorization, and that he had an adverse change in his medical condition, namely that he was no longer in stable recovery from his alcohol disorder. Upon that information, the FAA withdrew his authorization. And in furtherance of the FAA's safety mandate, we would not be doing our duty to the flying public if we allowed... Mr. Irwin is challenging that very positive drug test. That's his whole case. Here, let me take a second and describe to you my concern here, and maybe you can explain to me why it shouldn't be a concern. We're reviewing one document, the Barry Law. That's what we're reviewing. And it identifies two pieces of evidence, the positive alcohol test and his history of alcohol dependence. Those two things. Those are the two things in the Barry Law. So, as I look at the record, Irwin introduced quite a bit of evidence challenging both of these. Let me just mention a couple of them here. Unrebutted evidence that he accidentally ate food cooked in beer shortly before the test. Test results that came back negative on hair and nail samples just taken one day after that test. Literature showing that testing of this kind have a propensity for false positives. And finally, the report from a forensic toxicologist that the Irwin's positive test results are more consistent with accidental exposure to ethanol. All right, so those are his major things. Now, I look at the Barry letter and I see no response to any of that. I don't see any response to that. Even though the regulation under which you're operating, this is, I'm looking at 401I, says that someone who has their authorization withdrawn has a right to have the air surgeon not only review it, but his supporting medical evidence. He has to review, quote, his supporting medical evidence. So, given that, given the fact that Irwin has submitted extensive evidence to counter the major finding of Dr. Barry, and that Dr. Barry didn't respond to any of that, how can we sustain this? Well, what we have is a positive test certified by a laboratory, and the FAA's position is that... Sorry to interrupt you, but he challenges that. He has four, at least four pieces of evidence to suggest that that was a false positive. And it still may be that, it may well be that his evidence is not convincing, but Dr. Barry didn't consider it, at least not in his letter. I just don't see how we can sustain it. The agency's own regulation says he has a right to have his, quote, supporting evidence reviewed. That's what it says. I'm reading from your regulation, supporting medical evidence. You know what to do with that, right? Yes, Your Honor. That is what the regulation says. And Dr. Barry's letter does state that he reviewed the entirety of Mr. Irwin's airman medical file, and he also considered the additional information that he supplied. But the... This is an arbitrary and capricious case, right? You agree with that. I mean, we're applying the pretty standard, and an agency can't... I know of no case that says an agency can satisfy its burden under any of these statutes, APA or whatever, by simply saying, I considered the petitioner's evidence and found it without merit. We don't even do that. We can't do that. And I certainly don't see how a federal agency can do that. Well, what we have here is a positive alcohol test from an airman with a history of alcohol use. We rarely, if ever, don't have pilots who test positive, who don't come back to us with explanations for why it occurred. I mean, people are not always truthful with the FAA, and their livelihoods are on the line. We understand that. So that's why we require random, unannounced tests. I mean, there's a reason we have... Well, no, no, no. I'm not asking... I'm not questioning the testing. That's fine. I'm glad, as somebody who flies on airplanes, I'm really glad the agency does do random testing. But this case is about whether the results of that random test are accurate. Accurate enough to remove his authorization to file. That's what the case is about. Sure, and... It's a pretty standard administrative procedures case. The agency has made a fact-finding. That fact-finding has been challenged. And there's no evidence in the letter that the decision-maker considered the evidence. That's kind of black-letter law, administrative law. And add to that the history from our court telling you, in the Friedman case, which came up to us twice, you may be right, but you've got to support it. Sure. And we did consider the information that Mr. Irwin submitted. I mean, his own forensic... Could you show us where that was done? Show us right... Where was that evidence considered? Give me something in the record. Let's look at the Berry letter, for example. It's got to be in the Berry letter. Sure. And I do understand your concern, Your Honor. The letter says, I reviewed your agency medical file and the additional documentation you submitted in support of your request for review. So Dr. Berry is affirmatively stating in that sentence that he reviewed everything Mr. Irwin submitted. But you understand my concern about that, right? I mean, how can we review that unless he tells us, for example... I mean, here, I'll give you an example. So Dr. Berry, he says, I reviewed the evidence, right? But he doesn't say why Irwin's evidence that the positive test came from eating food that had been cooked in beer. He doesn't explain why he's rejecting that argument. He doesn't explain at all why he's rejecting the hair and nail sample evidence that Berry supplied. He doesn't tell what's wrong with that evidence. And he doesn't explain why the report from the forensic toxicologist is wrong. Now, they all may be wrong, as Judge Henderson just said. There may be good reasons for rejecting every one of those, but they're not in the Berry letter. I understand your concern that the letter could have been more robust. But I think here, the Federal Air Surgeon's position is that we are entitled to rely on an objective positive test to make a safety decision. And even Mr. Irwin's own forensic toxicology report that he submitted for us to consider says that this particular value, this numerical value, could be indicative of previous heavy drinking one to three days before the test, previous light drinking 12 to 36 hours before the test. I mean, those are irrational. Is that in the Berry letter? No, Your Honor, it is not. Ultimately, what's in the Berry letter is the fact that he tested positive and that that's contrary to the express terms and conditions of his authorization. Okay, well, thank you. I take your argument. I appreciate that. I have one question, Ms. Gardner. That is, if we were to remand along the lines as we did in Freedman, and let's say you all became convinced that you should have granted the motion for reconsideration of the withdrawal, would you vacate that withdrawal? And I'm asking the question, and the reason I'm asking the question is, if Mr. Irwin wins this case, his vacated withdrawal remains on his record. Is that entirely true? I'm not entirely sure procedurally what would happen here. I mean, hypothetically, if we were to reverse the withdrawal at this juncture, I mean, his original 2017 authorization is expired. And what would have happened upon the expiration of his authorization is that his medical qualifications would have been reviewed and re-evaluated to determine what, if any, modifications to his authorization were necessary at that juncture. And that is actually precisely what occurred here. We did review all of the additional information. We reviewed his discharge records and also his... Okay, here's my concern. If, let's say as a lawyer, a complaint is filed against me and it is eventually thrown out, it depends on the state law, but that record, my record, still shows a complaint against me that was dismissed. And that's my question. If this withdrawal is vacated, do you know, you may not know, what is reflected on Mr. Irwin's record? The short answer is I don't know procedurally. We obviously disagree that that should be the case, but we could always write a new letter withdrawing our previous reversal, so to speak. But there isn't really, given the procedural, informal nature of this, there isn't really a case file. There's just a medical file on file with the FAA that contains the entirety of his history with the FAA. So it would contain probably both the original withdrawal letter and our subsequent decision. All right. Thank you. If there are no more questions, Mr. Burns, why don't you take two minutes? Thank you, Your Honor. I would just like to address really one of the points that was raised there, which is the idea that the FAA is allowed to rely on a positive test. I don't disagree that the FAA can use that as a starting point, but their own literature suggests that it is not the end point for this analysis. All basically of the articles that they submitted in their appendix recognize the risk of exogenous exposure, through food in particular. And as a result of this, the literature that they cite recommends a threshold of 200 nanograms per milliliter or 250 nanograms per milliliter. Mr. Irwin had a negative test at those levels. The El Rashid article in particular notes that, quote, legal or disciplinary action based solely on a positive ETG test is inappropriate and scientifically unsupportable at this time. The Jatlow article suggests using a 200 nanogram per milliliter cutoff would, quote, reduce risk of interference from extraneous exposures. And as a result, they recommend those thresholds in a context where there are legal or livelihood ramifications. So the FAA's own cited authority rejects the proposition that the FAA can rely on this test, particularly when that is the sole basis that they're relying upon. You have to then take that and look at the context in which it occurs, the clinical history of the patient and what else you know about them. The Anderson Stryker article says- All right, we have all this evidence in the record. Thank you. Madam Clerk, if you'd call the next case.
judges: Henderson, Tatel, Wilkins